**In re RAYTECH CORPORATION, Debtor.**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Plaintiff,**

v.

**RAYTECH CORPORATION, Defendant.**

**Bankruptcy No. 5–89–00293. Adv. No. 95–5139.**

United States Bankruptcy Court, D. Connecticut.

Dec. 8, 1995.

---

Robert A. White, Robert E. Kaelin, Murtha, Cullina, Richter and Pinney, Hartford, Connecticut, for Raytech Corporation.

Michael Temin, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pennsylvania, Robert S. Evans, The Marcus Law Firm, New Haven, Connecticut, for Official Committee of Unsecured Creditors.

## MEMORANDUM AND ORDER UNDER 11 U.S.C. § 363(b)(1)

ALAN H. W. SHIFF, Bankruptcy Judge.

Raytech Corporation (the "Debtor") manufactures and sells friction products to the automotive and agricultural markets through wholly owned operating subsidiaries. Raytech has been found to be liable as a succes-sor for asbestos related injuries caused by products manufactured by Raymark Industries, Inc. Although the parties disagree as to the extent of that liability, that dispute is not material to the narrow issue presented here. *But see, Schmoll v. ACandS, Inc.*, 703 F.Supp. 868 (D.Or.1988), *affirmed*, 977 F.2d 499 (9th Cir.1992); *Raytech Corporation v. White*, 54 F.3d 187 (3rd Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 302, 133 L.Ed.2d 207 (1995).

On October 3, 1995, the Official Committee of Unsecured Creditors (the "Committee") filed adversary proceeding No. 95–5139, seeking to restrain the Debtor from authorizing one of its wholly owned subsidiaries, Raytech Composites, Inc. ("Composites"), from entering into an agreement to acquire the stock of an entity referred to herein as Company A. At an October 16th status conference, it was "ordered that pending a hearing on November 8, 1995, or whenever this court enters an order, whichever is later, Raytech and its affiliates are enjoined and restrained from entering into a binding agreement to acquire the stock, assets or business of Company A." *Transcript of November 8, 1995 hearing ("Tr.") at 2.* On that date, the Debtor and the Committee agreed that the issue in controversy is whether property of the estate may be used under Code § 363(b)(1) to acquire Company A. That subsection is the statutory predicate for this decision.

Code § 363(b)(1) provides

The [debtor in possession], after notice and a hearing, may use . . ., other than in the ordinary course of business, property of the estate.

## DISCUSSION

### I

■ More than the other substantive chapters of the code, chapter 11 is administered within a time line. Generally, courts are guided by the concept that debtors should be given a reasonable opportunity to reorganize within a reasonable period of time. *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), *see also, In re Broad Associates Ltd.*

*Partnership,* 110 B.R. 632, 635–36 (Bankr. D.Conn.1990). That concept supplies the answer to the innumerable controversies that arise during the preconfirmation period, such as motions for relief from the automatic stay, § 362(d); motions to shorten the exclusive period, § 1121(d); and motions to dismiss, § 1112. Section 363 matters usually do not spark debate over the fundamental goals of chapter 11. The instant matter does.

At the heart of those controversies is the question, for whom is the chapter 11 case being administered? The answer depends upon the debtor's prospects for reorganization. The Supreme Court and the Court of Appeals for this circuit have sent frequent and clear signals that the code should be read broadly to insure that those prospects are not prematurely thwarted. *See, e.g., Pioneer Investment Services Company v. Brunswick Associates Limited Partnership et al.,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (there is an "overriding goal of ensuring the success of the reorganization"); *In re Baldwin–United Corp. Litigation,* 765 F.2d 343, 348 (1985) (court may use its equitable powers to assure the orderly conduct of the reorganization proceedings); *MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 93 (2d Cir.1988), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) (liberal construction of court's power to enjoin suits that might impede reorganization process). But it is equally clear that "[t]he debtor's burden of demonstrating a reasonable possibility of a successful reorganization increases with time". *Travelers Life and Annuity Co. v. Ritz Carlton of D.C. Inc.,* 98 B.R. 170, 172 (Bankr.S.D.N.Y.1989).

■ The use of estate assets out of the ordinary course of a debtor's business under § 363 avoids the scrutiny imposed by the confirmation process. Usually, under the latter scenario, a debtor proposes a plan which will permit it to use its property to achieve its rehabilitation while it satisfies allowed claims and interests out of operating income. The comprehensive and complex plan confirmation provisions of § 1129 are designed to safeguard parties in interest. *Committee of Equity Security Holders v.*

*Lionel Corporation,* 722 F.2d 1063, 1071 (2d.Cir.1983). The use of property under § 363(b), on the other hand, is largely approved without those safeguards, raising the possibility that a transaction which might not survive the plan confirmation process might be accomplished in summary fashion under § 363(b). It has been suggested, for example, that § 363(b) could be used to "stretch" the bankruptcy laws to "effect an end run" around the protections granted creditors in Chapter 11. *See In re Continental Air Lines,* 780 F.2d 1223, 1224 (5th Cir.1986).

Courts have considered whether an especially large or financially significant transaction might constitute a piecemeal or *de facto* plan of reorganization, effectively eviscerating chapter 11 protections.

[A] Debtor in a Chapter 11 case cannot use section 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization.... [H]owever, post-petition, preconfirmation transactions outside the normal course of business may be required, and each hearing on a 363(b) transaction cannot be a mini-hearing on plan confirmation.

*In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877, 883 (Bankr.S.D.N.Y.1990). The question here, however, is not whether the acquisition should be tested by § 1129, it being clear from testimony that time is of the essence, but rather whether the acquisition will be allowed under § 363(b)(1).

*Lionel, supra,* 722 F.2d at 1071, requires that the court consider and expressly find from the evidence whether the Debtor has shown a "good business reason" to use its property to purchase Company A. Neither the code nor *Lionel* provides any specific definition of "good business reason". While the *Lionel* court provided some measure of guidance in enumerating certain factors, *Id.* at 1071, it expressly declined to "shackle" bankruptcy judges with rigid rules governing the exercise of their administrative powers under 363(b) and other provisions of the code. "A bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances." *Id.* at 1069. These principles were reiterated in *In re Chateaugay Corporation,* 973 F.2d 141 (2d

Cir.1992), in which the court affirmed an order under § 363(b), authorizing the sale of a subsidiary corporation of a chapter 11 Debtor. *Accord, In re Financial News Network Inc.,* 980 F.2d 165 (2d Cir.1992) (discussing "the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it," 980 F.2d at 169).

The authority of a debtor in possession to operate its business under § 1108, so that it may build capital, strengthen the company's finances, stimulate growth and market share, and maximize profits might clash with the duty to maximize distributions to creditors as quickly and efficiently as possible.

> In the non-bankruptcy takeover cases, management's fiduciary duties run primarily to the corporation's shareholders.... In contrast, the management of a bankrupt company must further the diverse interests of the debtor, creditors and equity holders, alike.

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.,* 147 B.R. 650, 658 (S.D.N.Y.1992), *appeal dismissed,* 3 F.3d 49 (2d Cir.1993). *See also In re Hupp Industries,* 140 B.R. 191, 195–196 (Bankr.N.D.Ohio, 1992); *In re America West Airlines, Inc.,* 166 B.R. 908, 911 (Bankr. D.Ariz.1994). That clash is evident here.

■ The enhanced status of creditors in Chapter 11 does not suggest that their interests are paramount to a debtor's right to pursue reorganization. To the contrary, as noted *supra* at page 150, the administration of chapter 11 is guided by a time line that initially affords an opportunity for reorganization, and so long as a debtor can sustain the burden of demonstrating a reasonable prospect of reorganizing within a reasonable time, creditors should not be permitted to interfere with the confirmation process. Generally, chapter 11 plans of reorganization provide for a payout over a period of years.

## II

The seminal issue here is whether the Debtor may make business decisions intended to promote growth or must it use its property to insure that its cash is available for distribution to unsecured creditors? The Debtor argues that if Composites cannot negotiate for the acquisition of Company A by the end of this year, it will lose that opportunity, with a corresponding loss of revenue which in turn will diminish the Debtor's prospects for reorganization. The Committee, on the other hand, argues that the purchase price is too high, the cash should be distributed to the unsecured creditors, and diverting that cash might impede the current mediation process by which the parties are attempting to negotiate a consensual plan.

Composites proposes to acquire the stock of Company A in two steps. First, it would pay $8 million in cash and $4 million dollars in equity in order to acquire 40% of the stock of Company A. The equity would be used to reduce outstanding long-term indebtedness of Company A. *Testimony, Albert Canosa, Tr. at 24.* In 1999, Composites would acquire the remaining 60% of the stock of Company A, at a price which would depend upon a multiple of Company A's actual net income for the year 1998. *Canosa, Tr. at 25–26.*

Aside from the requirement that the transaction be approved by this court pursuant to § 363(b)(1) criteria, it is further conditioned on completion of due diligence by Composites' management and final approval of its board of directors. *Canosa, Tr. at 34–35.* The Committee argues that the purchase price reflects unwarranted performance assumptions based upon projections supplied by Company A. The Debtor counters with the argument that its ultimate purchase depends upon its satisfaction after the performance of due diligence studies and that if the price is inflated, it has the right to decline the purchase unless the seller makes a satisfactory adjustment. Those safeguards, sufficiently defuse the Committee's concern, and I conclude from the evidence adduced at trial, as elucidated in the following findings, that the Debtor has offered a "good business purpose" for the acquisition of Company A.

Composites owns all of the stock of several operating subsidiaries, of which Raybestos Products Company ("RPC") is the largest and most profitable. RPC manufactures friction components for the Big Three auto-

mobile manufacturers and agricultural equipment manufacturers. A substantial portion of its revenues and profits are derived from six or seven customers. RPC presently holds a significant market share with these customers. The Debtor, operating through its subsidiaries, has performed well since it filed this bankruptcy case in 1989. Its compounded annual growth rate for 1989–1994 was 22%. Recently, however, RPC has reported an erosion in its market share with several of its major customers. It has learned that it will not be selected as the supplier on certain new transmissions for a major customer, and it believes that this will impact sales in 1997 and beyond. *Canosa, Tr. at 20.* The purchase of Company A is intended to increase RPC's share in the wet friction materials, construction, agricultural, and automotive transmissions replacement markets. The purchase would also create economies of scale that would increase profitability and create synergies with the business of Company A. *Canosa, Tr. at 28–29, 32.*

Both the Debtor and the Committee have filed disclosure statements and plans. It is unlikely those are the final plans. The Committee's expert, John H. Laeri, testified that in his opinion, the Committee's plan would not be acceptable. *Tr. at 98–100.* The parties have agreed to attempt to reconcile their differences through a mediation process. The number of creditors is not known and will have be estimated. *Testimony of Gene Lockes, Tr. at 136.* It is likely that any plan or plans that are considered for confirmation will include the creation of one or more trusts to distribute income generated by an ongoing business to current and future claimants. The Committee's objections that "cash is king", *Lockes, Tr. at 125,* the unsecured creditors will vote against any plan that does not maximize the immediate cash distribution, and diverting cash for the acquisition of Company A will be divisive to the mediation process, are unpersuasive. The Committee's expert conceded the obvious—that an economically strong Raytech is necessary to fund any such trust. *Laeri, Tr. at 107, 108.* It is just as obvious that reversing market share loss, achieving economies of scale, and developing new products will strengthen Raytech. The Debtor has made a good case

for the acquisition of Company A to achieve that goal.

## ORDER

For the foregoing reasons,

IT IS SO ORDERED that the Debtor's request for approval to authorize Composites to enter into an agreement to acquire the stock of Company A is granted.

AND IT IS FURTHER ORDERED that the restraining order entered on October 20, 1995 is lifted.