MAHONEY, Circuit Judge:
Plaintiff-appellant Hal M. Hirsch appeals from a judgment entered June 15, 1994 in the United States District Court for the District of Connecticut, José A. Cabranes, then-Chief Judge,[1] that granted the motion of defendants-appellees to dismiss Hirseh’s First Amended Complaint (the “Complaint”) for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) on the ground that Hirsch lacked standing to pursue the claims stated in the Complaint. Hirsch also appeals from Judge Cabranes’ ruling entered August 15,1994 that granted Hirsch’s motion for reconsideration of the dismissal of certain of his claims, but then adhered to the prior judgment.
We affirm the decisions of the district court.
Background
A. The Parties.
Hirsch is the trustee in bankruptcy of the consolidated estate (the “Consolidated Estate”) of Colonial Realty Company (“Colo *1088 nial”) and its general partners, Jonathan Googel and Benjamin Sisti (collectively the “Debtors”). See FDIC v. Colonial Realty Co., 966 F.2d 57 (2d Cir.1992) (approving consolidation of bankruptcy estates of the Debtors). Pursuant to a plea agreement dated May 5, 1993, Googel pled guilty to two counts of wire fraud, one count of bank fraud, and one count of attempting to impede the administration of the internal revenue laws. Pursuant to a plea agreement dated May 21, 1993, Sisti pled guilty to two counts of bankruptcy fraud, one count of wire fraud, and one count of structuring transactions to evade reporting requirements. Frank Shuch, who is not a party to this litigation, was the chief financial officer of Colonial and died on February 11,1992.
Arthur Andersen & Company (“Andersen”) and Weinstein, Schwartz & Pinkus (“Weinstein”) are accounting firms hired by Colonial to render various services to Colonial in connection with the syndication of real estate limited partnerships offered by Colonial. Sorokin, Sorokin, Gross, Hyde & Williams, P.C. (“Sorokin”) and Tarlow, Levy & Droney, P.C. (“Tarlow”) are law firms retained by Colonial in connection with Colonial’s syndication of real estate limited partnerships.[2]
B. The Allegations of Hirsch’s Complaint.
Because the Complaint was dismissed on motion pursuant to Fed.R.Civ.P. 12(b)(1), we accept as trae all of the allegations of the Complaint and construe them in Hirsch’s favor. Pennell v. City of San Jose, 485 U.S. 1, 7, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988); Thompson v. County of Franklin, 15 F.3d 245, 249 (2d Cir.1994).
Googel’s and Sisti’s criminal convictions—and the instant bankruptcy—both stem from illegal Ponzi schemes that they perpetrated through their partnership, Colonial, in collaboration with Andersen and the other defendants.[3] Googel and Sisti formed Colonial in the 1960s as a vehicle to sell real estate limited partnerships from which they derived interests in the real property and fees for management services. Beginning in 1975, Andersen performed extensive services for Colonial, Googel, and Sisti by providing forecasts and analyses for, and access to potential investors in, Colonial’s real estate syndications. Andersen’s initial contributions were “unofficial,” in that Colonial was not allowed to put Andersen’s name on any of the financial documents prepared by Andersen. In or about 1981, however, Andersen commenced formally placing its name upon financial documents prepared for Colonial’s syndications. In exchange for the expertise, credibility, and business contacts that the Andersen name provided to Colonial, Colonial agreed to hire Shuch, an alleged embezzler who was the brother-in-law of David Federman, a partner at Andersen with primary responsibility for the Colonial account.
Shuch, Googel, and Sisti then formed Colonial Realty II, a general partnership in which each of them held a one-third interest and which participated as a general partner in some of the Colonial limited partnership syndications. Googel, Sisti, or Colonial always was the other general partner in such partnerships in order “to control Shuch’s participation in the projects.” Shuch, in turn, established Consulting Enterprises, Inc. (“Consulting”), a Connecticut corporation, and performed all his work for Colonial and related entities as an employee of Con- *1089 suiting, for which he received in excess of $5.5 million in payments between 1986 and 1990. The Complaint alleges that “the fees generated from each syndication grew enormously as Andersen had represented they would if Shuch was retained,” and that thenceforth “the fees began to drive the syndication transactions.”
The Complaint further alleges that “Andersen sought to place Shuch as an employee of Colonial so as to obtain control of Colonial,” that “[t]he dramatic increase in Colonial’s business was a direct and proximate result of Andersen’s control over the Colonial syndications,” and that Googel and Sisti “may not have fully understood” the financial status of their burgeoning operations, while Andersen “knew everything” because it was “[sophisticated] and highly skilled in the business, real estate finance and syndication.” In addition, Shuch and Andersen took the lead in preparing the false and misleading private placement memoranda (“PPMs”) and financial forecasts by means of which the Ponzi schemes were primarily carried forward,[4] and Andersen “placed [its] investors in these deals.”
Thus, it is claimed that “Andersen created in Colonial an industry giant which Andersen could and did display to other potential clients as an example of the success and prestige which any company could attain if it hired and paid Andersen.” In a subsequent RICO case statement filed in compliance with a standing order of the district court, Hirsch asserted that “[Andersen]’s fraudulent and illegal conduct with respect to the projections and forecasts has caused the Debtors to incur extraordinary liabilities consisting of contingent financing obligations, guarantee obligations, and trade debt ... [, as] evidenced by the more than $10 billion in claims filed against [Colonial, Googel and Sisti], including approximately $6.9 billion in claims filed against the Debtors by investors.”
On the other hand, it is also alleged in the Complaint that “[i]f Andersen and Colonial did not find the forecasts to be attractive enough then the numbers were changed until they were [emphasis added],” and that “Colonial and Andersen knew that there was a clear inability to satisfy the dividends to the investors from the revenue of the respective partnership [emphasis added].”
In 1989, Colonial and Andersen formulated their largest transaction, involving the acquisition and syndication of a number of properties from the Travelers Insurance Company (the “Travelers Portfolio”). An acquisition team consisting of approximately ten Andersen employees and one Colonial employee undertook a due diligence evaluation of the acquisition (the “Due Diligence Investigation”). The Travelers Portfolio included Constitution Plaza, which consisted of five office buildings, a pedestrian plaza, and two parking garages in downtown Hartford, Connecticut, and various other properties located throughout the United States. As described in the Complaint, this syndication “was to be the project which would hide the Ponzi scheme and rehabilitate the Ponzi Participants [i.e., Googel, Sisti, Shuch, Colonial, and Andersen, see supra note 3]. Colonial, Andersen, Tarlow, Sorokin and Weinstein knew and discussed between them that if the Constitution L.P. [the limited partnership formed to acquire the Travelers Portfolio,] was not syndicated then Colonial would fail.”
Predicated upon Andersen’s conclusions following the Due Diligence Investigation, the Ponzi Participants were induced to cause Constitution L.P. to purchase the Travelers Portfolio for $179 million. Subsequently, however, only Constitution Plaza was offered in a public syndication, and the remaining Travelers Properties were transferred from *1090 Constitution L.P. to another Colonial-sponsored partnership. Although the offering sought to raise $60-72 million, only approximately $38.58 million was actually realized. The Complaint alleges that Andersen was both negligent and deliberately fraudulent in its conduct of the Due Diligence Investigation and preparation of subsequent financial analyses in connection with the public offering of Constitution Plaza, as a result of which Andersen was ultimately replaced as the auditor of Constitution L.P.
The new auditor of Constitution L.P., Joseph Cohan & Associates (“Cohan”), thereafter reported that the PPM distributed to investors with respect to the Constitution L.P. syndication was false and misleading, whereupon it was ostensibly determined in April 1990 that an amendment to the PPM and offer of rescission would be circulated to the investors in Constitution L.P. These documents were prepared “for the record,” and Shuch was designated to mail them, but it was never intended that they be mailed. Rather, “the Ponzi Participants” allowed further investors in Constitution L.P. to be solicited on the basis of the existing, misleading financial information.
The Complaint also alleges that Shuch transferred over $5.8 million in 1989 to his wife and to a trust which Federman served as trustee. These transfers greatly decreased the value of Shuch’s personal guarantees of payment on notes issued by investors in Constitution L.P., and commensurately increased the potential liability of Googel and Sisti as secondary guarantors of these notes. Andersen knew about these transfers as a result of preparing gift tax returns for Shuch with respect to them, and had a duty to inform Googel and Sisti concerning them, but never did so.
Despite Googel’s and Sisti’s participation in the Ponzi schemes, the Complaint alleges that they remained ignorant throughout the relevant time period of their own precarious financial position due to the fraud and/or negligence of Weinstein, which prepared Googel’s and Sisti’s personal financial statements. According to the complaint, “Wein-stein knew that the Financial Statements [of Googel and Sisti] would be utilized as the basis for the Net Worth Statements to be included in each private placement memorandum. Weinstein further knew that the Financial Statements would be used by Googel, Sisti and Colonial to obtain financial accommodations and extensions of credit thereto and to the partnerships.”
On September 14, 1990, involuntary bankruptcy proceedings were commenced against the Debtors in the United States Bankruptcy Court for the District of Connecticut. The eases were subsequently consolidated, and Hirsch was appointed as trustee of the Consolidated Estate. Hirsch thereafter commenced this action, and defendants-appellees moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1).
C. The Rulings of the District Court.
In its initial ruling, the district court dismissed the Complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) on the ground that Hirsch lacked standing, as trustee of the Consolidated Estate, to assert the claims stated in the Complaint. Hirsch v. Arthur Andersen & Co., 178 B.R. 40 (D.Conn.1994) (“Hirsch I”). Hirsch claimed standing under 11 U.S.C. § 541(a)(1), which provides:
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.[5]
The district court rejected Hirsch’s claim of standing on the following rationale:
Recognizing that he cannot assert claims against the defendants on behalf of the creditors, the trustee alleges damage to *1091 the debtors, to the extent of the unpaid obligations of the debtors to the creditors. Yet, the trustee has not alleged any distinct way in which the debtors were injured by the asserted wrongdoing of the defendants. Rather, the trustee alleges that the debtors suffered injuries identical to those of the creditors. Under these circumstances, it is the individual creditors, rather than the trustee, who may seek recovery from the defendants. Accordingly, the trustee lacks standing to assert these claims.
Hirsch I, 178 B.R. at 43.
Hirsch moved for reconsideration, limited to his claims for malpractice by Andersen in conducting the Due Diligence Investigation of the Travelers Portfolio. The district court granted reconsideration, see Hirsch v. Arthur Andersen & Co., No. 3:93-CV-1207 (JAC), slip op. at 3 (D.Conn. Aug. 11, 1994) (“Hirsch II ”), but adhered to its prior ruling, id. at 7. Chief Judge Cabranes concluded that “any damage suffered in connection with these properties was ultimately passed on to the investors,” id. at 4, who had “already asserted independent actions against the defendants for their participation in the Colonial scheme.” Id. He added that “there is a strong likelihood of a conflict of interest since the trustee stands in the place of the very parties who are alleged to have participated in defrauding the investors,” id., and concluded: “While the trustee has alleged that Arthur Andersen controlled the debtors in many respects, the court is not persuaded that the debtors are innocent victims of accounting malpractice or that Arthur Andersen’s conduct was truly distinct from the fraud in which they allegedly participated.” Id. at 6.
This appeal followed.
Discussion
Because the district court’s ruling was based solely upon the “complaint alone or the complaint supplemented by undisputed facts gleaned from the record,” Thompson, 15 F.3d at 249, we review its dismissal for failure of standing de novo. Id.; see also Board of Educ. v. New York State Teachers Retirement Sys., 60 F.3d 106, 109 (2d Cir.1995). We proceed to that consideration.
A. The Constitutional Requirement of Standing.
The Constitution confines the judicial power of the federal courts to deciding cases or controversies. U.S. Const, art. Ill, § 2, cl. 1. The doctrine of standing is derived directly from this constitutional provision. See Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984). It focuses upon the party seeking to invoke federal jurisdiction, rather than upon the jus-ticiability of the issue at stake in the litigation. See Flast v. Cohen, 392 U.S. 83, 99-100, 88 S.Ct. 1942, 1952-53, 20 L.Ed.2d 947 (1968). We have held that the Article III “ ‘case or controversy’ requirement coincides with the scope of the powers the Bankruptcy Code gives a trustee.” Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir.1991).
To have standing, “[a] plaintiff must [1] allege personal injury [2] fairly traceable to the defendant’s allegedly unlawful conduct and [3] likely to be redressed by the requested relief.” Id. at 751, 104 S.Ct. at 3324; see also Fulani v. League of Women Voters Educ. Fund, 882 F.2d 621, 624 (2d Cir.1989) (quoting Allen, 468 U.S. at 751, 104 S.Ct. at 3324). “A plaintiff must always have suffered ‘a distinct and palpable injury to him-self_” Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (quoting Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). The injury must be “concrete in nature and particularized to [the plaintiff],” In re United States Catholic Conference (“USCC”) (Abortion Rights Mobilization, Inc. v. Baker), 885 F.2d 1020, 1023-24 (2d Cir.1989), cert. denied, 495 U.S. 918, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990), and not “[a]bstract,” “conjectural,” or “hypothetical,” City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).
As the multitude of standing cases indicates, however, “[t]hese terms cannot be defined so as to make application of the constitutional standing requirement a mechanical *1092 exercise.” Allen, 468 U.S. at 751, 104 S.Ct. at 3324. Accordingly, the Supreme Court instructs us to “compar[e] the allegations of the particular complaint to those made in prior standing cases,” id. at 751-52, 104 S.Ct. at 3325, while keeping in mind the important role that the doctrine of separation of powers plays in limiting the scope of judicial authority, id. at 752, 104 S.Ct. at 3325.
B. Standing of the Trustee.
As previously noted, because this case comes before us on an appeal from the grant of a motion to dismiss, we must accept as true all of the factual allegations in Hirsch’s 1,136-page, 7,397-paragraph complaint asserting 465 separate causes of action. See Warth, 422 U.S. at 501, 95 S.Ct. at 2206-07 (1975). General, conelusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint. See Jenkins v. S & A Chaissan & Sons, Inc., 449 F.Supp. 216, 227 (S.D.N.Y.1978); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1363, at 464-65 (2d ed. 1990); cf. In re American Express Co. Shareholder Litig. (Lewis v. Robinson), 39 F.3d 395, 400-01 n. 3 (2d Cir.1994) (“[C]onelusory allegations of the legal status of the defendants’ acts need not be accepted as true for the purposes of ruling on a motion to dismiss.”) (collecting cases). We may consider all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken. See Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir.1993); Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir.1991). The burden to establish standing remains with the party claiming that standing exists, i.e., Hirsch. See E.F. Hutton & Co. v. Hadley, 901 F.2d 979, 984 (11th Cir.1990); 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3522, at 63-65 (2d ed. 1984).
A careful review of the Complaint reveals that the alleged acts and omissions at issue in this case can be broken down into eight different categories: (1) fraud perpetrated upon the investors in the Colonial limited partnerships by all of the defendants-appel-lees in contributing to the misleading PPMs; (2) negligence and fraud by Andersen in rendering advice to the Debtors regarding the purchase and syndication of the Travelers Portfolio; (3) professional malpractice by all of the defendants-appellees in preparing and/or disseminating financial information for the PPMs; (4) breach of contract by all of the defendants-appellees in rendering deficient professional services to the Debtors; (5) breach of fiduciary duties owed to the Debtors by all of the defendants-appellees in knowingly participating in the fraud upon investors and/or deliberately withholding such knowledge from Googel and Sisti; (6) fraud and breach of fiduciary duty by (a) all of the defendants-appellees for tacitly condoning Shuch’s failure to mail the rescission letters and PPM amendments to the investors in Constitution L.P., and (b) Andersen for helping Shuch to transfer $5.8 million to his wife and a trust so as to undermine Shuch’s capacity as a guarantor of Colonial obligations, and failing to disclose the transfers to Googel and Sisti; (7) professional malpractice by Weinstein in preparing misleading personal financial statements for Googel and Sisti; and (8) one RICO claim against Anderson predicated upon the Ponzi Participants’ use of the mails and wires in connection with their ongoing, illegal activity in furtherance of the Ponzi schemes of Colonial.
Each cause of action, however, is traceable to one of only two types of events alleged in the complaint: (1) the distribution of misleading PPMs to investors; or (2) the provision of deficient professional services directly to Googel, Sisti, and Colonial. See In re Wedtech Corp. (Wedtech Corp. v. KMG Main Hurdman), 81 B.R. 240, 241 (S.D.N.Y.1987) (“[A]s alleged against an accountant, claims of fraud, malpractice, aiding and abetting a fraud ..., fraudulent transfer, breach of fiduciary duty, unjust enrichment, and monies had and received, allege what is essentially ‘a single form of wrongdoing under different names.’ ”) (quoting Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 453 (7th Cir.), cert. denied, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982)).
*1093 “Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded, inter alia, on the rights of the debtor and on certain rights of the debtor’s creditors, see, e.g., 11 U.S.C. §§ 541, 544, 547 (1982 & Supp. V 1987). Whether the rights belong to the debtor or the individual creditors is a question of state law.” St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 700 (2d Cir.1989); see also In re Ionosphere Clubs, Inc. (Sobchack v. American Nat’l Bank & Trust Co.), 17 F.3d 600, 607 (2d Cir.1994) (“Bankruptcy courts have long been charged with ascertaining, under state law, whether claims belong to the bankruptcy estate or to other claimants.”). Thus, the trustee stands in the shoes of the debtors, and can only maintain those actions that the debtors could have brought prior to the bankruptcy proceedings. Wagoner, 944 F.2d at 118 (collecting cases).
Connecticut law has recognized the standing of creditors to maintain causes of action for negligence, breach of fiduciary duty, and fraud in precisely these circumstances. See Gengras v. Coopers & Lybrand, No. CV-92 0517836S, 1994 WL 133424, at *5 (Conn.Super.Ct. Mar. 31, 1994) (limited partner may maintain breach of fiduciary duty and fraud claims against accountant hired by general partner who fails to disclose general partner’s fraudulent activities to limited partner); see also Tackling v. Shinerman, 42 Conn.Supp. 517, 630 A.2d 1381, 1384 & n. 2 (1993) (Connecticut law recognizes liability in negligence of attorneys and accountants to third parties whose reliance is foreseeable without regard to privity); Twin Mfg. Co. v. Blum Shapiro & Co., P.C., No. 380220, 1992 WL 38319 (Conn.Super.Ct. Feb. 18, 1992), at *2 (conduct “approaching,” but not constituting, privity adequate to establish liability in negligence of accountant).
Further, when creditors, such as the investors in the Colonial limited partnerships, have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so. As we stated in Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir.1985):
The Trustee in bankruptcy has standing to represent only the interests of the debt- or corporation. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). Therefore, he has no standing to assert claims of damage to the defrauded purchasers of securities. Rochelle v. Marine Midland Grace Trust Co., 535 F.2d 523, 527 (9th Cir.1976).
Id. at 62 n. 4; see also Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1101 (2d Cir.1988) (The conduct of defendants, officers 'of a bankrupt corporation, “—bribery, perjury, fraud, and bankruptcy fraud—caused [plaintiff creditor] monetary damage, and the right to recover for that injury belongs, not to [the bankrupt corporation] or its bankrupt estate, but to [plaintiff].”), cert. denied, 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989); Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1042 (2d Cir.) (right to recover for alleged tort committed against creditor by officer of bankrupt corporation belongs to creditor, not the bankruptcy estate), cert. denied, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986).
In a factually analogous case before the Eleventh Circuit, the court held that claims arising out of a Ponzi scheme belonged only to the defrauded investors, and the trustee lacked standing to sue. Hadley, 901 F.2d at 986-87. The court reasoned that the bankruptcy code precludes a trustee from seeking to collect money not owed to the bankruptcy estate, and that any action by the trustee would be duplicative of pending litigation brought by the defrauded investors. Id.; see also Williams v. California 1st Bank, 859 F.2d 664, 666-67 (9th Cir.1988) (defrauded investors, rather than bankruptcy trastee, entitled to pursue claims arising from bankrupt corporation’s Ponzi scheme); In re Ozark Restaurant Equip. Co. (Mixon v. Anderson), 816 F.2d 1222, 1225 (8th Cir.1987) (“[W]here ... ‘the applicable state law makes such obligations or liabilities run to the corporate creditors personally, rather than to the corporation, such rights of action are not assets of the estate under Section 541(a) that are enforceable by the trustee [under Section 704(1) ].’ ” (quoting 4 Collier on Bankruptcy ¶ 541.10[8], at 541-69 to 541- *1094 70 (15th ed. 1986))) (final alteration in Ozark), cert. denied, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987).
It follows that claims predicated upon the distribution of misleading PPMs to investors in Colonial limited partnerships are the property of those investors, and may be asserted only by them and to the exclusion of Hirseh. We note in this regard that class actions are being vigorously litigated in behalf of the investors. See, e.g., Seeman v. Arthur Andersen & Co., 896 F.Supp. 250 (D.Conn.1995); In re Colonial Ltd. Partnership Litig. (Pasternak v. Colonial Equities Corp.), 854 F.Supp. 64 (D.Conn.1994).
There remain for consideration, however, the claims that are predicated upon professional malpractice alleged to have injured the Debtors. We ruled in Wagoner that “when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors.” 944 F.2d at 118. Further, “[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation.” Id. at 120 (collecting cases). We have also ruled that a corporation may not assert RICO claims against its agents for committing illegal actions “ostensibly on the corporation’s behalf’ that ultimately redound to its disadvantage. American Express, 39 F.3d at 400 (discussing In re Crazy Eddie Sec. Litig., 714 F.Supp. 1285, 1290-91 (E.D.N.Y.1989)).
These precedents would appear to foreclose any action by Hirseh to hold the defendants-appellees liable for professional malpractice on the basis that activities undertaken by them to effectuate the Ponzi scheme also impacted adversely upon Goo-gel, Sisti, and Colonial. The district court did not rely upon this rationale, however, stating:
It is noteworthy that a trustee lacks standing to sue third parties who have joined in defrauding creditors. See Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir.1991). This principle appears to have been applied to bar standing only in eases where the third party is alleged to have aided and abetted the debtors in defrauding creditors. See id. at 120 (collecting cases). In the instant case, the trustee has alleged that Arthur Andersen controlled the debtors. Because this distinction is arguably significant, the court declined to expressly rely on this precedent to bar the trustee’s suit in its Ruling. The court now notes, however, that the debtors’ alleged participation in defrauding creditors is indeed relevant (if not disposi-tive) on the issue of trustee standing.
Hirseh II, slip op. at 6 n. 4. Thus, in addressing on reconsideration Hirsch’s claims of malpractice by Andersen in performing the Due Diligence Investigation of the Travelers Portfolio, the district court reaffirmed its prior ruling on the basis that “any damage suffered in connection with [the Travelers Portfolio] was ultimately passed on to the investors.” Id. at 4.
We agree with the district court that there is likely to be little significant injury that accrues separately to the Debtors in this case. We also note in this connection Hirsch’s assurance in his main appeal brief that in light of Colonial’s distressed financial condition, any recovery in this case will inure in tato to creditors, and the Debtors will be entirely excluded from any participation. Nonetheless, there is at least a theoretical possibility that some independent financial injury to the Debtors might be established (however remote the prospect of any actual net recovery therefor) as a result of the alleged professional malpractice by defendants-appellees.
In any event, we are persuaded that the Wagoner rule should be applied here, and that Hirseh is precluded from asserting the professional malpractice claims alleged in the Complaint because of the Debtors’ collaboration with the defendants-appellees in promulgating and promoting the Colonial Ponzi schemes.[6] Hirseh points, in opposition to *1095 this view, to the Complaint’s allegations that Andersen “controlled” the Debtors, and invokes Kalb, Voorhis & Co. v. American Fin. Corp., 8 F.3d 130 (2d Cir.1993), in support of his position.
In Kalb, we ruled that a trustee for a bankrupt corporation had standing under applicable Texas and Ninth Circuit law to bring an action against another corporation that was the former controlling stockholder of the bankrupt corporation. We held that the trustee would not be barred from proceeding on the basis that the bankrupt corporation was in pari delicto with the putative defendant, because the latter entity “forced the [bankrupt] corporation to act for the benefit of the [controlling] shareholder through domination and control.” Id. at 133.
Kalb is not dispositive in this case. As noted earlier, we are not bound by the Complaint’s eonclusory allegations of control. Further, even what Hirsch alleges is something less than control, and certainly something far less than the position of the controlling stockholder in Kalb. We focus the following analysis upon those allegations of the Complaint that Hirsch cites in his main appeal brief in support of his argument that Andersen controlled the Debtors.
The Complaint alleges that “Andersen sought to place Shuch as an employee of Colonial so as to obtain control of Colonial,” but immediately thereafter adds:
88. Notwithstanding that Colonial eventually retained Shuch, Googel and Sisti were skeptical of making Shuch a full partner of Colonial. Rather, Googel, Sisti and Shuch formed Colonial Realty II, a general partnership in which each of Goo-gel, Sisti and Shuch maintained a one-third 06) interest.
89. In partnerships in which Colonial Realty II was a general partner, Colonial, Googel and/or Sisti were also general partners. In this way, Googel and Sisti sought to control Shuch’s participation in the projects.
The Complaint also asserts “Andersen’s control over the Colonial syndications,” adding that “Googel and Sisti may not have fully understood the impact of the vast loss-. es in many of the syndications,” but that Andersen “knew everything,” was “[sophisticated] and highly skilled” in real estate finance and syndication, and took the lead in preparing the PPMs for the various syndications. This hardly amounts to total domination and control by Andersen of the Debtors. Indeed, it is the ordinary situation for generalist business executives to be less skilled and knowledgeable concerning specialized areas of activity than the professionals, whether employees or independent contractors, engaged in those areas of activity on behalf of the business enterprise.
Further, it is undisputed that Googel and Sisti were the general partners of Colonial, and that they or entities that they controlled were the general partners in the various limited partnerships used to syndicate their real estate ventures. In addition, the Complaint specifically alleges that the Financial Forecasts were revised in more favorable terms if not suitable to “Andersen and Colonial,” and that both “Colonial and Andersen” were aware of the continuing inability of the limited partnerships to generate income adequate to meet their commitments to the investors. The Complaint itself describes the Debtors as “Ponzi Participants,” see supra note 3, an unlikely description for entirely subordinate, dominated toilers in the Ponzi vineyard. Finally, we may take judicial notice that both Googel and Sisti pled guilty to multiple felonies arising from their involvement in Colonial’s activities.
In sum, domination and control of the Debtors by Andersen is not even meaningfully alleged in the Complaint. Further, the Complaint’s attenuated allegations of control are contradicted both by more specific allegations in the Complaint and by facts of which we may take judicial notice. Thus Wagoner, rather than Kalb, controls decision, and Hirsch lacks standing to assert claims of malpractice against defendants-appellees.
*1096 Finally, in light of the very fundamental deficiencies in Hirseh’s assertions of standing and the overall history of this litigation, the district court did not abuse its discretion by dismissing the Complaint without granting leave to amend. See Manson v. Stacescu, 11 F.3d 1127, 1133 (2d Cir.1993), cert. denied, — U.S. -, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994).
Conclusion
The judgment of the district court, and its ruling adhering to that judgment on reconsideration, are affirmed.

. Judge Cabranes became a member of the Second Circuit Court of Appeals on September 26, 1994.

. Neither Sorokin nor Tarlow has filed a brief or otherwise appeared on this appeal. Hirsch’s brief indicates that Tarlow has settled this litigation, as well as related litigation brought by investors in Colonial limited partnerships. Andersen’s counsel stated at the outset of his oral argument to this Court that Sorokin joins in the argument and brief presented on appeal by Andersen.

. A ponzi scheme is a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors. The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors.
In re Huff (McHale v. Huff), 109 B.R. 506, 512 (S.D.Fla.1989). The Complaint describes Colonial, Googel, Sisti, Shuch, and Andersen as the “Ponzi Participants.”

. Andersen is alleged to have provided PPMs for the following limited partnerships commencing May 15, 1984: 84 Century Hills L.P.; Colonial Galt Ocean L.P.; Colonial Cheshire I L.P.; Colonial Cheshire II L.P.; Colonial Gold L.P.; Colonial Gold L.P. (1987); Colonial Metro L.P. (1987); Colmark I L.P. (1987); Dwellco II L.P. (1987); Colonial Portsmouth L.P. (1987); Colonial Wyndham L.P. (1987); Colonial Broadwater L.P. (1988); Colonial Southbury L.P. (1988); Colonial Metro Zero Coupon Mortgage Trust (1988); Colonial Equipment Leasing I L.P. (1988); Colonial Healthcare L.P. (1988); Ad-vest/Colonia! Tamarac L.P. (1988); Colonial Capitol Center L.P. (1988); Advest/Colonial Chatfield L.P. (1989); Colonial Mesa L.P. (1989); Colonial Constitution L.P. (1989); Colonial Constitution Zero L.P. (1990).

. Section 323(b) of title 11 vests a trustee in bankruptcy with the capacity to sue and be sued in behalf of the bankruptcy estate, and section 704(1) directs such a trustee to “collect and reduce to money the property of the estate for which such trustee serves."

. Hirseh contends in his main appeal brief that our "decision in Wagoner that the trustee had standing to assert a claim for churning provides strong support for the entitlement of [Hirseh] to assert his malpractice claims against Andersen for insufficient acquisition due diligence.” We *1095 disagree. Wagoner viewed the alleged churning by the brokerage house in that case as clearly distinct from the alleged fraud perpetrated against the bankrupt corporation’s investors. See 944 F.2d at 119-20. By contrast, Andersen’s Due Diligence Investigation in this case was closely tied to the subsequent syndication of Constitution Plaza to investors by Constitution L.P.