**In re CALDOR, INC.—NY The Caldor Corporation, Caldor, Inc.—CT, et al., Debtors.**

**Bankruptcy No. 95 B 44080 (JLG).**

United States Bankruptcy Court,
S.D. New York.

March 11, 1996.

Kaye, Scholer, Fierman, Hays & Handler, L.L.P., New York City, for Debtors.

Pullman, Comley, Bradley & Reeves, Bridgeport, Connecticut, for People's Bank.

Zalkin, Rodin & Goodman, New York City, for Chemical Bank as Agent for Pre–Petition Secured Lenders.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for the Official Committee of Unsecured Creditors.

Berlack, Israels & Liberman L.L.P., New York City, for the Official Committee of Equity Holders.

JAMES L. GARRITY, Jr., Bankruptcy Judge.

The Caldor Corporation ("Caldor") has moved pursuant to §§ 363(b)(1), 1107 and

1108 of the Bankruptcy Code ("Code") for an order authorizing it to enter into a lease ("Westfield Lease") of a building located in Westfield, Massachusetts ("Westfield Facility") for use as a regional distribution center. The Official Creditors' Committee and the Official Committee of Equity Holders support the motion as a sound exercise of Caldor's business judgment. So does the pre-petition bank group. The People's Bank (the "Bank") is the only entity objecting to the motion. Because we find that the Bank lacks standing to be heard on this motion, we overrule the objection and grant the motion.[1]

### Facts

The facts as established during the March 6, 1996 evidentiary hearing are as follows. On September 18, 1995, Caldor and 21 affiliated entities (the "debtors") filed separate petitions for relief under chapter 11 of the Code in this district. Debtors have continued in possession and control of their businesses and assets as debtors in possession pursuant to §§ 1107 and 1108 of the Code. On September 27, 1995, and January 11, 1996, the Office of the United States Trustee formed an Official Committee of Unsecured Creditors and an Official Committee of Equity Holders, respectively.

The debtors collectively operate 166 stores in ten states, including New York, New Jersey, Connecticut, Massachusetts, Pennsylvania and Maryland. They currently receive and distribute merchandise to those stores on a non-regional basis utilizing two distribution centers. One is approximately 600,000 square feet and is located in North Bergen, New Jersey ("North Bergen Facility"). The other is approximately 500,000 square feet and is located in Newburgh, New York ("Newburgh Facility"). In addition, debtors utilize two warehouse and trailer parking facilities located near the North Bergen Facility. Beginning in 1994, debtors retained several consultants to analyze their distribution system and provide long range planning assistance in that regard. The study was completed in 1995 and recommended that the debtors regionalize their distribution processes to minimize the distance between the centers and stores, and update the equipment at the distribution centers. On the strength of those recommendations, and with the assistance of a consultant, debtors determined that a regional distribution center should be opened in the Springfield/Westfield, Massachusetts area. As of the commencement of these cases, Caldor was party to a lease of a distribution facility to be constructed in Westfield, Massachusetts. Ultimately, with the support of the creditors, Caldor rejected that lease.

By this motion, Caldor seeks to enter into the Westfield Lease. The underlying premises is 527,000 square feet to which the landlord will add a shipping wing of approximately 125,000 square feet. The initial term of the lease is 25 years with two 10 year renewal periods exercisable at Caldor's option. Among other things, the Westfield Lease provides that landlord must undertake and complete all on and off site construction, including the alterations to the existing building ("Phase I Construction") and the construction of the shipping wing ("Phase II Construction"), in accordance with plans developed by debtors in conjunction with the landlord. The construction must be done by a general contractor selected through a competitive bidding process. Caldor expects the Phase I and Phase II Construction to be completed by July 1, and September 1, 1996, respectively. It plans to install automated sorting equipment in the Westfield Facility once the alterations are completed. Caldor estimates that the fixtures and machinery, including the sorting system, needed to operate the distribution center will cost $10 million and that the installation of the sorting equipment will occur more or less contemporaneously with the Phase II Construction. The Westfield Lease gives Caldor the option to expand the distribution center during the first 10 years of the lease and to add up to an additional 350,000 square feet to the facility.

---

1. Our subject matter jurisdiction of this contested matter is predicated on 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (M).

Both committees have closely analyzed the Westfield Lease and the assumptions underlying Caldor's decision to enter that lease. Both firmly support the motion. The prepetition bank group is purportedly owed approximately $469 million. It too has reviewed the transaction and supports the motion. Debtors lease the Newburgh Facility under a long term lease ("Newburgh Lease") with Northeast Business Center Associates–50 ("Northeast"), the owner of that facility. Northeast owes the Bank approximately $18 million pursuant to a loan agreement with the Bank. That loan is secured by a mortgage lien on the Newburgh Facility, as well as an assignment of rents payable under the Newburgh Lease. The Bank contends that this motion must be denied because:

1. Caldor has not articulated a sound business reason for entering into the Westfield Lease;

2. under the doctrine purportedly established by the Second Circuit in *In re Klein Sleep Products, Inc.*, 78 F.3d 18 (2d Cir. 1996), the motion is premature; and

3. under the doctrine purportedly established by the Fifth Circuit in *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir.1986), cited in *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y.1990), the transaction constitutes a *sub rosa* plan that cannot be approved without the protection of a plan and disclosure statement.

Caldor disputes those assertions and contends that it should be authorized to enter the Westfield Lease. As a preliminary matter, it asserts that the Bank lacks standing to object to the motion.

### Discussion

■ We must first consider the issue of the Bank's standing. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (the issue of standing "is a threshold question in every federal case, determining the power of the court to entertain the suit"). The Bank contends that it has standing to be heard on this motion, and on any other issue in these cases, by reason of its alleged substantial economic interest in debtors' reorganization due to its purported

interest in debtors' eventual assumption or rejection of the Newburgh Lease. It maintains that because it may not have complete recourse against Northeast or Northeast's principals in the event Northeast defaults under its loan, it will have resort only to the value of the Newburgh Facility for recovery of its $18 million loan. It contends that if Caldor enters into the Westfield Lease, in possible derogation of the Newburgh Lease, and then rejects the Newburgh Lease, either because the Westfield Facility supplants the Newburgh Facility or because debtors are unable to remain in business, the Bank will have indirect rights to a claim for breach of contract which, even if "capped" pursuant to § 502(b)(6) of the Code, would still be a claim in excess of $7.5 million. The Bank maintains that it is entitled to assurances that debtors will be in a position to pay as much as possible on account of the claims of general unsecured creditors, rather than incurring major administrative expense claims and other post-petition costs and expenses to the detriment of those creditors.

■ The concept of standing subsumes a blend of constitutional requirements and prudential considerations. *Warth v. Seldin*, 422 U.S. at 498, 95 S.Ct. at 2205. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.*

The "case or controversy" limitation in Article III, section 2 of the United States Constitution is intended to limit[ ] the business of the federal courts to "questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process," and it defines the "role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of the government."

*U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980). "Justiciability" is the term "employed to give expression to the dual limitation placed upon federal courts by the case-and-controversy doctrine." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950,

20 L.Ed.2d 947 (1968). "In its constitutional dimension, standing imparts justiciability: whether plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III." *Warth v. Seldin,* 422 U.S. at 498, 95 S.Ct. at 2205. Article III mandates that the allegedly aggrieved party demonstrate actual or threatened injury as a result of wrongful conduct, that the injury be traced to the challenged action and that it is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). To have standing a party must assert its own legal rights and interests and cannot rest its claim to relief on the legal rights or interest of third parties, *Valley Forge,* 454 U.S. at 474, 102 S.Ct. at 759; *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205; *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1091 (2d Cir.1995), and the complaint must fall within the zone of interests to be protected or regulated by the statute at issue. *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760; *Hirsch v. Arthur Andersen & Co.,* 72 F.3d at 1091.

 Section 363(b) of the Code bars a debtor from selling, using or leasing property, other than in the ordinary course of business, without a court order entered after "notice and a hearing". *See* 11 U.S.C. § 363(b)(1). It protects the reasonable expectations of creditors and shareholders that a debtor in possession's business will be operated in the normal course. *See In re McLean Industries, Inc.,* 96 B.R. 440, 443 (Bankr.S.D.N.Y.1989) (statute bars debtor "from removing the horse from the barn prior to notifying parties in interest and affording them an opportunity to be heard before the court"); *see also In re Johns–Manville Corp.,* 60 B.R. 612, 615–18 (Bankr. S.D.N.Y.1986) (analyzing use of term "ordinary course of business" in § 363(b)). The "notice and a hearing" requirement in the statute is intended "to give creditors who have a vital interest in maximizing realization from the assets of the estate, an opportunity to review the terms of a proposed sale, and to object thereto, if they deem the terms and conditions not to be in their best interests."

*In re Sapolin Paints, Inc.,* 11 B.R. 930, 936 (Bankr.E.D.N.Y.1981). Thus, Bankruptcy Rules 6004 and 2002(a)(2) direct that an application under § 363(b) be provided to the debtor, the trustee, all creditors and the indenture trustee. Additionally, under Rule 2002(d)(3), shareholders must be notified of a proposed sale of substantially all of a debtor's assets.

The relief sought in the motion does not directly affect the Bank and a denial of the motion will not redress any injury to the Bank. The Bank has failed to allege any injury, let alone injury concrete in nature and particularized to Caldor. *See Hirsch v. Arthur Andersen & Co.,* 72 F.3d at 1091. At best, the Bank is asserting rights belonging to Northeast. Significantly, there is no evidence that Caldor's execution of the Westfield Lease violates any provision of the Newburgh Lease. Because the Bank admits that it is neither a creditor nor shareholder of Caldor, or any of the debtors, it is not within the zone of interests protected by the statute. Thus, under a traditional standing analysis, the Bank cannot be heard on this motion. *See In re McLean Industries, Inc.,* 96 B.R. at 445; *see also Roslyn Savings Bank v. Comcoach Corp. (In re Comcoach Corp.),* 698 F.2d 571, 573 (2d Cir.1983) (mortgagee of debtor's lessor lacks standing to obtain stay relief under § 362 of the Code).

 The Bank argues that under § 1109(b) of the Code it is a "party in interest" with standing to be heard on this motion. That provision protects a party "having a stake in the outcome of the bankruptcy case", or "a right at issue in a particular proceeding". *In re McLean Industries, Inc.,* 96 B.R. at 444 (citations omitted). Whether such an interested party exists is " 'governed by the Code's purposes' ". *Id.* (quoting *In re Comcoach Corp.,* 698 F.2d at 573). Because § 363(b) is intended to protect creditors and shareholders, and the Bank is neither, and does not otherwise have a stake in this case or the relief sought in the motion, it is not a "party in interest" under § 1109(b) of the Code. *See In re McLean Industries, Inc.,* 96 B.R. at 444.

The Bank misplaces its reliance on *International Trade Administration v. Rensselaer Polytechnic Institute*, 936 F.2d 744 (2d Cir.1991). In that case, Pacmore Bearings, Inc. ("Pacmore") entered into a ground lease for vacant property belonging to Rensselaer Polytechnic Institute ("RPI"). Pacmore planned to construct a ball-bearing manufacturing facility in the land. Thereafter, with RPI's consent Pacmore assigned its right, title and interest under the lease to Kubar Bearings, Inc. ("Kubar"). Home & City Savings Bank lent $3 million to Kubar to finance the construction and equipping of a manufacturing facility. Kubar's leasehold interest secured $2 million of that loan. Kubar defaulted under the lease and the bank cured the default. Thereafter, Kubar and Pacmore jointly filed for relief under chapter 11 of the Code. Three years later, Kubar's case was converted to one under chapter 7 of the Code. The chapter 7 trustee moved for an extension of time within which to assume or reject the lease and the bankruptcy court denied the motion. The bank appealed that determination and the district court affirmed. On appeal RPI contended, among other things, that only the trustee had standing to appeal. The court rejected that contention. In considering that matter, the court first noted that the Code does not contain an express statutory directive on who has standing to appeal from a bankruptcy court order. Thus, it applied "the general rule, loosely modeled on the former Bankruptcy Act, that in order to have standing to appeal from a bankruptcy court ruling, an appellant must be a 'person aggrieved'—a person 'directly and adversely affected pecuniarily by' the challenged order of the bankruptcy court." 936 F.2d at 747 (citations omitted). Because the bank held a $2 million secured interest in the disputed lease, the court found that the bank would be directly and adversely impacted pecuniarily by an affirmance of the district court the bank order and thus was an aggrieved person with standing to appeal. *Id.* In contrast, the Bank has no direct economic stake in these cases. Thus, *International Trade* is distinguishable and does not support the Bank's argument.

 We note that the evidence demonstrates that execution of the Westfield Lease is a sound exercise of Caldor's business judgment. *See, e.g., In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.1983); *In re Raytech Corp.*, 190 B.R. 149 (Bankr.D.Conn.1995). Moreover, the Bank's concern that Caldor's estate will be burdened with a large administrative priority claim in the event the Westfield Lease is subsequently rejected, *compare In re Klein Sleep Products, Inc.*, 78 F.3d 18, is minimized by the landlord's agreement to limit any such claim to an amount equal to rent, additional rent and estimated operating expenses for a period of two years and its obligation to mitigate damages in the event of Caldor's rejection or other disposition of the Westfield Lease. Finally, this transaction does not qualify as a *sub rosa* plan. *Compare In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877. In any event, we need not reach those issues because the Bank lacks standing to be heard on the motion and the parties whose interests are directly impacted by the motion support it. *Compare In re McLean Industries, Inc.*, 96 B.R. at 445 (§ 363(b)(1) does not impose an independent obligation on the court to examine the underlying transaction absent an objection).

### Conclusion

Based on the foregoing, the Bank's objection is overruled and the motion is granted.