Richard C. BREEDEN, Trustee of the Bennett Funding Group, Inc., et al., Plaintiffs,

v.

KIRKPATRICK & LOCKHART, LLP, et al., Defendants.

Richard C. Breeden, Trustee of the Bennett Funding Group, Inc., et al., Plaintiffs,

v.

Robinson, St. John & Wayne, et al., Defendants.

Richard C. Breeden, Trustee of the Bennett Funding Group, Inc., et al., Plaintiffs,

v.

Storch & Brenner, LLP, et al., Defendants.

Richard C. Breeden, Trustee of the Bennett Funding Group, Inc., et al., Plaintiffs,

v.

Arthur Andersen & Co., Defendants.

MDL 1153.
Nos. 98 Civ. 7043(JES), 98 Civ. 7045(JES), 99 Civ. 2869(JES), 98 Civ. 7044(JES).

United States District Court, S.D. New York.

Aug. 21, 2001.

Kaye Scholer LLP, Jay G. Strum, of counsel, New York City, for Plaintiff Richard C. Breeden.

Saperston & Day P.C., Dennis R. McCoy, of counsel, Buffalo, NY, for Plaintiff Richard C. Breeden.

Rivkin Radler LLP, Janice J. DiGennaro, of counsel, Uniondale, NY, for Defendants Robinson, St. John & Wayne, et al.

Proskauer Rose LLP, Richard L. Spinogatti, Allison B. Feld, of counsel, New York City, for Defendants Kirkpatrick & Lockhart LLP, et al.

Kramer Levin Naftalis & Frankel LLP, Gary P. Naftalis, Gregory A. Horowitz, of counsel, New York City, for Defendants Storch & Brenner, et al.

Weil, Gotshal & Manges LLP, Irwin H. Warren, Jeffrey M. Greilsheimer, of counsel, New York City, for Defendant Arthur Andersen LLP.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Richard Breeden, bankruptcy trustee ("plaintiff" or "trustee") for the Bennett Funding Group, Inc. ("BFG")[1] brings these actions against various law firms and accountant Arthur Andersen (collectively "defendants") for professional malpractice, breach of fiduciary duty, breach of contract, unjust enrichment, negligent misrepresentation, negligence[2] and fraudulent transfer of funds based on services rendered to BFG prior to its declaration of bankruptcy in 1996. Defendants now move for summary judgment contending that plaintiff lacks standing to pursue these claims. For the reasons set forth below, the Court grants defendants' motion.

## BACKGROUND

BFG filed for bankruptcy in the Spring of 1996. Following this filing it came to light that BFG management had orchestrated what the trustee has characterized as the largest Ponzi scheme in history. In his complaints in these actions the trustee alleges that each defendant knew, had reason to know, or could have known through reasonable investigation, of this scheme. Plaintiff contends that defendants breached their respective professional duties to BFG by failing to report such fraud—or even suspicions of such fraud—to the company's innocent directors and officers. Absent such a breach, plaintiff contends, the Ponzi scheme would have ended sooner and thus the amount of BFG's insolvency would have been less than it was at the time of its bankruptcy filing.

Defendants challenge plaintiff's standing. Defendants contend that because the company's controlling officers and shareholders either perpetrated or ratified the fraud, the trustee is barred as a matter of law from pursuing these claims. Moreover, they argue that BFG has not suffered a distinct injury as a result of defendants' allegedly deficient services. Defendants moved for summary judgment on these bases and the Court, over plaintiff's objection, held a hearing on such motion.

## DISCUSSION

I. *The Court's Authority to Conduct a Hearing on Standing*

■ The trustee contends that the Court lacked the authority to conduct a

---

1. Plaintiff is the bankruptcy trustee for debtor companies other than BFG. The record in this action and other related proceedings reveals that these corporations were related to BFG and were controlled by the Bennett family. Accordingly, references to BFG should be understood to include all of the bankrupt companies the Bennetts controlled.

2. The claims for negligence and negligent misrepresentation are brought only against defendant Arthur Andersen.

factual hearing with respect to his standing. The Court disagrees. It is a fundamental precept of our legal system—and the parties do not dispute—that the Court alone must decide questions of law. In deciding questions of law, federal district courts are frequently called upon to make fact findings. For instance, in ruling on the admissibility of scientific expert testimony pursuant to the doctrine announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), a judge must make fact findings regarding the reliability of evidence; such findings may require that a court decide whether the scientific evidence offered is generally accepted or has been tested. *See, e.g., Campbell ex. rel. Campbell v. Metropolitan Prop. and Cas. Ins. Co.*, 239 F.3d 179, 184–85 (2d Cir. 2001). Similarly, when ruling on the admissibility of a confession in a criminal proceeding, the Court must make preliminary fact findings regarding the confession's voluntariness outside the presence of the jury—although a jury will ultimately decide the weight to be given such confession. *See* 18 U.S.C.A. § 3501 (West 2000). Courts also frequently make fact findings when determining the presence of personal jurisdiction. *See, e.g., New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 29 (2d Cir.1997) (where plaintiff's personal jurisdiction is challenged, court must conduct a hearing before resolving disputed facts against such plaintiff). In short, fact findings are often essential to the Court's role as the sole judge of the law.

■■■ The notion of standing presents a legal question of constitutional import and is a "jurisdictional prerequisite to a federal court's deliberations." *Hodel v. Irving*, 481 U.S. 704, 711, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987). As a general matter, a district court may "conduct appropriate proceedings to determine whether it has jurisdiction." *In re U.S. Catholic Conference*, 824 F.2d 156, 162 (2d Cir.1987), *rev'd on other grounds*, 484 U.S. 975, 108 S.Ct. 484, 98 L.Ed.2d 482 (1987). With respect to the particular jurisdictional issues involved in challenges to standing, the Second Circuit Court of Appeals ("the Second Circuit") notes that in certain cases "it may become necessary for the district court to make findings of fact to determine whether a party has standing to sue." *Rent Stabilization Ass'n of New York v. Dinkins*, 5 F.3d 591, 594 (2d Cir.1993). The case of *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) also implicitly supports the Court's power to conduct a hearing on standing. In that decision, the United States Supreme Court reviewed a standing determination made by a district judge following four days of evidentiary hearings; the *Duke Power* Court did not question—in fact it failed to even mention—the authority of the district court to conduct such hearings. *See Duke Power Co.*, 438 U.S. at 72, 98 S.Ct. 2620. The *Duke Power* Court simply assumed—as if the proposition was were incontestable—that the district court had the power to make fact findings on standing. It seems clear, therefore, that the Court acted well within its discretion in conducting a hearing on the trustee's standing.

Nevertheless, the trustee persists in his opposition by arguing that the Court should not have conducted a hearing because issues regarding standing are so intertwined with issues regarding the merits of these claims that it would be necessary to decide the merits of the case to determine plaintiff's standing. *See London v. Polishook*, 189 F.3d 196, 198–99 (2d Cir. 1999). The Court disagrees. The factual determinations necessary to establish standing are minimally—if at all—intertwined with the merits of the trustee's

action. As discussed more fully below, to determine standing under the law of the Second Circuit, the Court must ascertain: (1) the level of involvement of BFG's stockholders and managers in the aforementioned Ponzi scheme; and (2) whether these individuals dominated and controlled BFG. *See infra* Part II. Conversely, resolution of the merits of the trustee's claims would involve an analysis of defendants' professional duty to plaintiff, their alleged breach of such duty, and the causal nexus between such alleged breach and the damages claimed by the trustee. Thus, there is not sufficient intertwining of issues to preclude a factual hearing with respect to the trustee's standing.[3]

Yet even if the Court agreed that the necessary intertwining was present, the only consequence of such a finding would be the application of a summary judgment standard to defendants' motion. *See London,* 189 F.3d at 198. The Court has repeatedly noted to the parties that the record presented in connection with defendants' summary judgment motion is alone sufficient to render a decision on the trustee's standing. Accordingly, the trustee suffered no prejudice from having to participate in a hearing. Quite to the contrary, the Court decided to hold a hearing out of an abundance of caution and in order to allow the trustee an additional opportunity to bring forth evidence in support of his standing. The Court therefore overrules the trustee's objection to its decision to hold a hearing on standing.[4]

## II. The Trustee's Standing

"Standing ... is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 117 (2d Cir.1991) (citation excluded). The party whose standing is challenged must have a "personal stake in the outcome of the controversy" in order to meet the case and controversy requirement of Article III of the Constitution. *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (internal quotations and citation omitted); *Wagoner,* 944 F.2d at 118. A party can only assert its own legal rights and cannot assert the rights of third-parties. *See Warth,* 422 U.S. at 499, 95 S.Ct. 2197. Moreover, a bankruptcy trustee like plaintiff "stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Wagoner,* 944 F.2d at 118. State law, in this case the law of New York, determines if a right to sue belongs

---

**3.** The case the *London* Court cites in support of this "intertwining" principle, *Careau Group v. United Farm Workers of America, AFL–CIO,* 940 F.2d 1291 (9th Cir.1991), illustrates how rarely the principle applies. The Ninth Circuit Court of Appeals in *Careau Group* found that there was sufficient intertwining to prohibit fact findings on the jurisdictional question. In support of its decision, the *Careau Group* Court emphasized that "the jurisdictional issue *is* the merits" because the parties had stipulated to facts unrelated to jurisdiction which compelled a merits resolution once jurisdiction was decided. *See id.* at 1293 (emphasis in original). By contrast, resolution of the standing issue here would leave countless questions regarding defendants' professional duties to plaintiff unresolved and unaffected.

**4.** The trustee's reliance upon *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238 (2d Cir.1984) is equally unavailing. In that decision the Second Circuit found it was improper for the district court to make fact findings with respect to an affirmative defense—plaintiff's statute of limitations. *See id.* at 242–45. The trustee's standing here is a jurisdictional prerequisite, not an affirmative defense, and thus fact findings by the court are entirely appropriate.

to a bankrupt corporation or its creditors. *See In re: The Mediators, Inc.*, 105 F.3d 822, 825 (2d Cir.1997). Plaintiff therefore only has standing to bring claims that BFG itself had standing to pursue at the time BFG filed for bankruptcy in 1996.

■■■■ A bankruptcy trustee lacks standing under New York law to seek recovery on behalf of a debtor company against third-parties for injuries incurred by the misconduct of the debtor's controlling managers. *See Wight v. BankAmerica Corp.*, 219 F.3d 79, 86–87 (2d Cir.2000); *In re Mediators, Inc.*, 105 F.3d at 826–27; *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir.1995); *Wagoner*, 944 F.2d at 120. This axiom, also known as the *"Wagoner* rule,"

> derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation. Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in.

*Wight*, 219 F.3d at 86–87 (citations omitted). Accordingly, a trustee cannot sue third-party professionals for allegedly aiding and abetting corrupt management in a scheme to defraud the debtor corporation; such a cause of action accrues to the creditors of the defunct corporate entity, not the trustee. *See, e.g., In re Mediators*, 105 F.3d at 826; *Wagoner*, 944 F.2d at 120. Plaintiff does not state his claim expressly as one for aiding and abetting the participants in the Ponzi scheme. Nevertheless, asserting that the malpractice of BFG's outside counsel and accountants allowed the Bennetts to perpetuate their fraudulent scheme is sufficiently analogous to implicate the *Wagoner* rule and defeat the trustee's standing. As the Court describes more fully below, the essential triggers of the rule are present: the dominant managers of the debtor company BFG, including its only two shareholders, orchestrated and/or tolerated and endorsed a fraud on creditors and a bankruptcy trustee has subsequently attempted to implicate third-party professionals in wrongs for which these dominant individuals are directly responsible. It follows that the trustee may not pursue such a claim on behalf of BFG.

■■■■ Plaintiff argues that he avoids the effects of the *Wagoner* rule because of the so-called "adverse interest exception" to the imputation rule of New York agency law and its federal law corollary as distilled in *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P.*, 212 B.R. 34 (S.D.N.Y.1997) (Knapp, J.). Plaintiff misconstrues the law. "Under the [adverse interest] exception, management misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation." *Wight*, 219 F.3d at 87. However, "the adverse interest exception is itself subject to an exception styled the 'sole actor' rule." *In re Mediators*, 105 F.3d at 827. The sole actor rule applies where the corporate principal and its agent are indistinguishable, such as where the agent is a corporation's sole shareholder, *see Wagoner*, 944 F.2d at 120; *In re Mediators*, 105 F.3d at 827, or where the corporation bestows upon its agent unfettered control and allows the agent to operate without meaningful supervision with respect to a particular type of transaction. *See Munroe v. Harriman*, 85 F.2d 493, 496 (2d Cir.1936); *accord In re Dublin Secs. Litig.*, 133 F.3d 377, 380 (6th Cir.1997). These rules emerge from the notion that:

> where the agent is defrauding the principal ... disclosure cannot be presumed because it would defeat—or have defeat-

ed the fraud. However, where the principal and agent are one and the same .... [the sole actor rule] imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal.

*In re Mediators,* 105 F.3d at 827 (citation omitted). Thus the *Wagoner* rule imputes the misconduct of corrupt management to the corporation whenever management dominates the company—such as in the sole shareholder context—or where the corporation delegates all authority over a portion of its business to a particular manager or managers. *See Munroe,* 85 F.2d at 496.

Contrary to plaintiff's argument, the *Wechsler* decision simply restates these basic premises when it notes that "the *Wagoner* rule only applies where *all* relevant shareholders and/or decision[-]makers are involved in the fraud." *Wechsler,* 212 B.R. at 36 (emphasis in original). This language does not stand for the proposition, as the trustee would have it, that the presence of *any* innocent officer, director, or shareholder avoids the imputation of fraudulent acts by management to the corporation. Indeed, to the extent the *Wechsler* Court refers to "all *relevant* shareholders and/or decision[-]makers" it concedes the well-accepted proposition that some members of management are irrelevant for the purposes of applying the *Wagoner* rule. *See id.* (emphasis added). Only management that exercises total control over the corporation—or that exercises total control over the type of transactions involved in the particular fraudulent activity at issue—are relevant. Judge Knapp indicates that the *Wagoner* rule would not apply if there were someone "involved in [debtor's] management who was ignorant of the ongoing fraud and could and would if advised of facts known to defendant have taken steps to bring the

fraudulent conduct to an end." *Id.* The Judge is undoubtedly correct that the presence of a person with the ability to bring an end to the fraudulent activity at issue would demonstrate that principal and agent are distinct entities and that the total control necessary for an application of the *Wagoner* rule is not present. However, as a matter of fact, the trustee fails to offer evidence that such a relevant, innocent decision-maker existed at BFG.

Simply put, facts elicited through discovery and in testimony given at the hearing established beyond a peradventure of doubt that: (1) Bud, Kathleen, Patrick and Michael Bennett ("the Bennett family" or "the Bennetts") were the only four (4) relevant decision-makers at BFG; and (2) no member of the Bennett family was innocent with respect to the Ponzi scheme. The witnesses at the hearing were uniform in their testimony that ultimate decision making authority on all issues of significance rested to varying degrees with each of the Bennetts. For instance, Joseph Rocco, Assistant Controller at BFG from 1985 to 1990, testified that nobody outside the Bennett family had final decision-making authority at BFG. *See* Transcript of Hearing on Standing Motion dated April 19, 20, & 24 2001 ("Tr.") at 344. Similarly, Richard F. MacPherson, a former football coach for Syracuse University and the New England Patriots ("Coach MacPherson") who served as a director and executive committee member at BFG from 1993–1996, testified that the Bennetts "ran everything." *Id.* at 169. The documentary evidence substantiates these characterizations. In a 1989 memo to all BFG managers, Bud Bennett stated:

each Manager will respond promptly to any order from a "Bennett" which will be in writing. In a rare exception, another order may conflict with an existing

policy initiated by a Bennett, (the Bennett's [sic] will resolve any differences). Defendants' Hearing Exhibit ("Def. H. Exh.") P, July 6, 1989 Memo from Bud Bennett. In a similar vein, the Bennetts set the agenda for every Board of Directors meeting, scripted speaking parts for the various attendees, and distributed the scripts before each meeting began. *See* Def. H. Exhs. S, AA; Tr. at 262–65; 172–74. At these meetings—which Mr. Kuppel described as a "joke"—no substantive company business was ever discussed. *See* Tr. at 262. As the Court noted at the aforementioned hearing, the testimony about the Bennetts' complete control over the decision making at BFG "stands uncontradicted." *See* Tr. at 356.[5]

Bud and Kathleen Bennett, the company's only two (2) shareholders, delegated unfettered control of BFG's financial operations to their son Patrick. The testimony at the hearing bore witness to this reality. Mr. Rocco agreed that Patrick Bennett "was running the company." Tr. at 325. Mr. Rocco and Paul Usztok, the CEO of one of the Bennett affiliate companies, both testified that they knew of no one other than Bud and Kathleen that had the authority to investigate Patrick's actions. *See* Tr. at 328; Transcript of Video Deposition of Paul Usztok taken May 4, 2001 ("Usztok Tr.") at 48. Patrick Bennett exercised total control over all of BFG's cash through the use of a "Byzantine arrangement" whereby money of origins known

only to Patrick moved between the various Bennett affiliate companies. *See* Usztok Tr. at 50–51. Indeed, it was Patrick Bennett, rather than BFG's treasurer Kevin Kuppel, who negotiated loans, controlled bank accounts, and approved cash disbursements. *See* Tr. at 253–54. Mr. Kuppel did not even know what the finance department actually did. *See id.* at 254. The trustee offers no evidence to contradict this testimony establishing Patrick's domination of BFG's financial operations.

Bud and Kathleen were active managers of BFG who were both aware of and acquiesced in the fraudulent activities orchestrated primarily by their son Patrick. For example, in 1990 Mr. Rocco and William Crowley, BFG's Chief Accounting Officer and a director, wrote Bud Bennett a memorandum expressing their concern about fraudulent representations made to BFG's auditors at the direction of Patrick. *See* Affidavit of Irwin H. Warren dated April 9, 2001 ("Warren Affidavit"), Exh. 10, March 8, 1990 Memo from W.P. Crowley and J.E. Rocco to E.T. Bud Bennett re: Audit Issues; Tr. at 317–27. Bud later told Mr. Crowley that "he had talked to Pat and ... everything was all right [sic]." *See* Warren Affidavit, Exh. 11, Transcript of Testimony of William Crowley taken on November 13, 2000 in *United States v. Wager*, 99 Cr. 257 (S.D.N.Y.) (AKH) at 691. Later, in the Fall of 1995, Timothy White, CEO of another BFG affiliate, became aware of the massive double-pledg-

---

**5.** The evidence submitted to the Court establishes that the Bennetts exercised total control over BFG as a matter of fact. Moreover, as a matter of law, the trustee is judicially estopped from disputing the Bennetts control over BFG. In a prior proceeding in which the trustee moved for—and obtained—consolidation of the Debtors' estates, he submitted an affidavit stating that "every decision that impacted materially upon the debtors' businesses [w]as made or approved by the Bennetts acting in concert or alone." Affidavit of

Janice J. DiGennaro dated May 24, 2000 ("DiGennaro Affidavit"), Exhibit ("Exh.") 47, Affidavit of Stewart Weisman in Support of the Trustee's Motion for an 'Order Substantively Consolidating the Debtors' Estates dated April 18, 1997 at ¶ 19. The doctrine of judicial estoppel prevents the trustee from disputing this factual contention made before and adopted by the bankruptcy court through its order substantively consolidating the debtors' estates. *See Mitchell v. Washingtonville Central Sch. Dist.*, 190 F.3d 1, 6 (2d Cir.1999).

ing of leases by Patrick and brought that fact to the attention of Bud and Kathleen. *See* Transcript of Video Deposition of Timothy White taken April 11, 2001 ("White Tr.") at 73–77. Mr. White told Bud and Kathleen that they should be prepared to fire Patrick and asked for full access to the finance department to conduct an audit. *See id.* Bud indicated to Mr. White that the double-pledging was a mistake and said the Bennetts would take care of it. *See id.* at 76. Nevertheless, it is undisputed that after this confrontation the double-pledging of leases at the heart of the Ponzi scheme continued until BFG declared bankruptcy in 1996. *See* Tr. at 95–96; DiGennaro Affidavit, Exh. 44 (letter indicating that after October 25, 1996 there were over one million dollars of double-pledged leases). Plaintiff does not contradict this evidence showing that Bud and Kathleen, at the very least, were both aware of and acquiesced in Patrick's fraudulent activities. And even assuming—despite substantial evidence to the contrary[6]

—that Bud and Kathleen were not actively involved in the Ponzi scheme, their delegation of total control over the financial operation of BFG to Patrick,[7] and their failure to prevent him from continuing with the Ponzi scheme after they became aware of it, are sufficient to invoke the *Wagoner* rule. *See Munroe*, 85 F.2d at 496.

The record before the Court establishes that the innocent officers and directors the trustee has identified are irrelevant for the purposes of applying the *Wagoner* rule. There is no evidence to suggest that any of these individuals either could have or would have stopped the fraud. As already noted, the Bennetts had total control over all decisions of substance. All others employed at BFG "served at the pleasure of the Bennetts." Tr. at 267. None of the individuals the trustee presented as witnesses had any real authority. Kevin Kuppel, for example, was nominally BFG's treasurer but had no responsibilities with respect to cash flow or bank accounts and

6. Although it is unnecessary for the purposes of resolving the trustee's standing, the Court finds that there is sufficient evidence to establish Bud and Kathleen's active involvement in covering up and/or furthering the Ponzi scheme. First, in connection with adversary proceedings commenced against them, Bud and Kathleen each invoked their Fifth Amendment privilege against self-incrimination when asked about their own personal involvement in covering up and/or furthering the fraud. *See* DiGennaro Affidavit, Exhs. 52, 53. Having invoked such privilege, the Court is permitted to—and does—draw an adverse interest against Bud and Kathleen with respect to their involvement in the scheme. *See LiButti v. United States*, 107 F.3d 110, 123–24 (2d Cir.1997). Moreover, the witnesses at the hearing were uniform in their testimony that Bud and Kathleen had control over the business and their approval was necessary for "anything of substance." Tr. at 249. Finally, the trustee himself has repeatedly asserted in adversary proceedings against the Bennetts that Bud and Kathleen had actual knowledge of and accepted benefits from the fraud. *See*

Warren Affidavit, Exh. 38, Complaint in *Breeden v. Bennett, et al.*, Adv. Pro. 96–70154 (Bankr.N.D.N.Y.) at ¶¶ 70, 276. Such statements constitute evidentiary admissions binding on the trustee unless he persuasively controverts them. *See United States v. McKeon*, 738 F.2d 26, 31 (2d Cir.1984); *Guadagno v. Wallack Ader Levithan Assocs.*, 950 F.Supp. 1258, 1267 (S.D.N.Y.1997). The trustee has offered nothing but conclusory allegations in his motion papers to dispute the involvement of Bud and Kathleen in the fraud. Considering this evidence together, the Court concludes that Bud and Kathleen Bennett permitted, endorsed, and otherwise perpetuated the Ponzi scheme.

7. There is evidence before the Court, and the trustee does not dispute, that Michael Bennett was also involved in the Ponzi scheme—but was largely just following Patrick's orders. *See* White Tr. at 63–64, 68. Accordingly, the trustee does not submit, and the Court will not discuss, Michael as an innocent, relevant decision-maker who might have stopped the fraud.

was ignorant of the company's cash disbursement process. *See* Tr. at 253–54. Similarly, Coach MacPherson, although a director and member of the executive committee, admitted he was a "mere public relations figurehead" who did "not have any responsibilities." *Id* at 136, 212–13. The impotence of officers and directors outside the Bennett family became most evident after some of them became aware of the fraud.

In the Fall of 1995, Bud and Patrick allowed some of the more senior officers at BFG who had learned of the massive double-pledging of leases to form a so-called "oversight committee." *See* Usztok Tr. at 44. However, this committee had no ability to implement its suggestions for preventing double-pledging. *See id.* at 45. The Bennetts had veto power over the committee's recommendations. *See id.* at 45–47. The only power the committee members had—one which virtually all of them exercised—was the threat of resignation. *See id.* Indeed, those who resigned did so because of their belief that they were powerless to effect the changes necessary to stop the fraud. *See* White Tr. at 80; Usztok Tr. at 17, 37–39. Thus, even senior officers aware of improper double-pledging in the amount of fifty (50) million dollars were completely powerless to remedy the situation and ensure that the fraud would not continue. *See* Tr. at 70, 97–99; White Tr. at 80; Usztok Tr. at 38–39.

Finally, the conclusory contentions of the innocent insiders that if informed of the fraud they would have taken action to stop it, contradict their own testimony, are speculative, and are inconsistent with their own behavior. A number of the witnesses testified that upon learning of the fraud they would have first approached one of the Bennetts and accepted their assurances that the fraud would be remedied or that nothing wrong had taken place. *See*

Tr. at 146 (testimony of Coach MacPherson indicating he would have gone first to Bud Bennett); DiGennaro Affidavit, Exh. 46, Deposition of Joanne Corasaniti taken March 20, 1997 at 393–94 (indicating she would have accepted any satisfactory answer from one of the Bennetts and would have left the company if she learned that there was any illegal activity occurring at BFG). Given the above-described willingness of Bud and Kathleen to tolerate the fraud—and especially considering their steadfast refusal up to the present day to acknowledge that any Ponzi scheme ever existed—the fruitlessness of approaching either of them is readily apparent. *See* Def. H. Exh. V, Letter from Bud Bennett to the Media dated March 26, 1999 (denying that there was any Ponzi scheme at all); DiGennaro Affidavit Exh. 66 (answers to interrogatories submitted by Bud and Kathleen Bennett in March, 2000 denying existence of Ponzi scheme). Approaching Patrick, the chief architect of the fraud, or his compliant brother Michael would be equally unavailing. Thus the assertion of these insiders that they could and would have stopped the fraud is contradicted by their own testimony.

The witnesses that did not indicate their intention to confront one of the Bennetts all speculated that if given definitive evidence of fraud they likely would have approached an attorney to determine the proper course of action. *See* Tr. at 42 (Lester), 237 (Kuppel); Usztok Tr. at 52–56. None of these individuals could say whether an attorney would have advised them to inform the SEC or another outside entity of the fraud. *See, e.g.,* Usztok Tr. at 54. It is unclear whether such insiders would have had the legal ability to approach third-parties with information about the Ponzi scheme. In any event, no attorney was called at the hearing or submitted any affidavit indicating that he did or would give such advice. Whatever the

case, the stated intentions of these innocent insiders that they would have informed a third-party, such as the SEC, amount to nothing more than mere speculation and conjecture. Indeed, Coach MacPherson testified that as far as he knew the SEC was a good football conference. *See* Tr. at 154.

Underscoring the speculative nature of this testimony are the actual actions of these innocent insiders. Faced with evidence that company investors and other creditors had been defrauded of at least fifty (50) million dollars, not one of these individuals did anything to alert the company's counsel, outside auditors, or government authorities. *See* Usztok Tr. at 32–33. Indeed, insiders were aware of wrongdoing as far back as 1990, *see* Tr. at 317–27, but not one of them did anything more than ask the Bennetts to remedy a fraud that the Bennetts themselves had committed. Not a single person took even a preliminary step towards disclosing wrongdoing to outsiders despite ample opportunity to do so. In fact, in 1995, less than two (2) weeks after he became aware of millions of dollars of double-pledged leases, Kevin Kuppel spent time with BFG's lawyers preparing to testify before the SEC in connection with that agency's ongoing investigation of the company. *See* Tr. at 283–85. Kuppel mentioned nothing of his discovery to the lawyers or the SEC. *See id.* Mr. Kuppel, like Mr. Rocco before him, and like Messrs. White, Usztok, and Lester after him, kept the knowledge of the fraud inside the BFG family. Most of these impotent insiders left BFG when they realized that the Bennett family members could not—or would not—right the wrongs discovered. All of them, however, stayed silent after departing BFG.

Actions speak louder than words; the actions of these so-called innocent insiders belie the words they swore to before the Court.

Yet, even assuming that these innocent insiders would have exposed the fraud, the trustee still lacks standing because, as already noted, these insiders were all impotent and irrelevant for the purposes of applying the *Wagoner* rule. The Fifth Circuit Court of Appeals best summarized the deficiencies in the trustee's contention that a third-party could have saved the company, or at least lessened BFG's insolvency,[8] if made aware of the fraud: "This argument is flawed because . . . . [the company] cannot claim it should recover from [defendant auditors] for not being rescued by a third-party for something [the company] was already aware of and chose to ignore." *FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir.1992). In summary, because BFG's injury is traceable to its own dominant management, the trustee lacks standing to pursue claims on BFG's behalf against defendants.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted due to plaintiff's lack of standing. The Clerk of the Court is hereby directed to close the above-captioned actions.

**It is SO ORDERED.**

---

**8.** Because the Court finds that the involvement of BFG's dominant management in the Ponzi scheme defeats the trustee's standing by operation of the *Wagoner* rule, it is unnecessary to—and the Court will not—address defendants' additional argument that the trustee lacks standing because BFG suffered no distinct injury.