In re SHARP INTERNATIONAL CORP. and Sharp Sales Corp., Debtors.

**Sharp International Corp., Plaintiff,**

v.

**KPMG LLP, Defendant.**

**Bankruptcy Nos. 99–21317–608, 99–23347–608.**

**Adversary No. 01–1439–608.**

United States Bankruptcy Court, E.D. New York.

Jan. 24, 2005.

784

Foley & Lardner LLP, New York City, for Plaintiff.

Willkie Farr & Gallagher, New York City, for Defendant.

CARLA E. CRAIG, Bankruptcy Judge.

This matter comes before this Court on the motion of KPMG LLP ("KPMG") for summary judgment in this adversary proceeding, commenced by Sharp International Corp. ("Sharp" or "Debtor"). For the reasons set forth herein, this motion is denied.

KPMG performed audits of, and issued reports with respect to, Sharp's financial statements for the fiscal years ending March 31, 1997 and March 31, 1998. (Complaint Doc. 1, ¶¶ 28, 33).[1] Sharp charges KPMG with negligence, gross negligence, and recklessness, asserting that KPMG failed to conduct the 1997 and 1998 audits of Sharp in accordance with generally accepted auditing standards ("GAAS"), and failed to detect that Sharp's financial reporting was not in conformity with generally accepted accounting principles ("GAAP"). (Complaint ¶ 72.) Sharp alleges that as a result of KPMG's malpractice, the Spitz family, who ran the day-to-day operations at Sharp, were able to loot the company of more than $43 million, and seeks to recover actual damages as well as punitive damages against KPMG. (Complaint ¶¶ 74–75, A.)

KPMG seeks summary judgment pursuant to Federal Rule of Civil Procedure 56(c), made applicable to these proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure. KPMG asserts that Sharp's chapter 11 trustee (the "Trustee") does not have standing to bring this action because the fraud that was perpetrated by management at Sharp must be imputed to the corporation. KPMG argues Sharp lacks standing because there was not at least one innocent decisionmaker at Sharp in a management role or

---

1. "Doc." refers to documents listed on the bankruptcy court's docket, by docket number.

amongst the shareholders who could have stopped the fraud. (SMJ Memo at 1.)[2] The Trustee asserts there was such a person at Sharp, Jaime Bohorodzaner ("Bohorodzaner"), who could have stopped the fraud had he uncovered it prior to his death in 2000. (Tr. Resp. Mem Doc. 46, at 14.)[3]

### Facts

The following relevant facts are not in dispute, except as indicated.

From 1961 until the sale of substantially all of its assets in July 2000, Sharp was engaged primarily in the business of importing and distributing wrist watches, clocks, pens and mechanical pencils. (Complaint ¶ 12; SMJ Mem at 1.) After purchasing 100% of Sharp's common stock in 1993, Bernard, Herbert and Lawrence Spitz (collectively, the "Spitzes") served as Sharp's Chief Executive Officer, President and Chief Financial Officer respectively, with responsibility over Sharp's day-to-day affairs. (Complaint ¶ 13.)

In January 1995, the Spitzes sold 13% of Sharp's common stock to Bohorodzaner, Inc. for $2 million. (Complaint ¶ 14; Stock Purchase Agreement and Shareholder Agreement, each dated as of Jan. 1, 1995, among Lawrence Spitz, Bernard Spitz, Herbert Spitz, Bohorodzaner, Inc. and Sharp (the "Stock Purchase Agreement" and the "Shareholder Agreement", respectively).) The Stock Purchase Agreement and the Shareholder Agreement gave Bohorodzaner, Inc. various corporate governance rights, including, but not limited to, a seat on Sharp's Board of Directors, the right to inspect Sharp's books and records at any time, and the right to veto a wide array of corporate transactions. (Complaint ¶ 14; Shareholder Agreement, Stock Purchase Agreement.) The Trustee asserts that from January 1995 to October 1999, Bohorodzaner, the principal of Bohorodzaner, Inc., served as a member of Sharp's Board of Directors (Complaint ¶ 14), while KPMG questions whether Bohorodzaner was ever actually a shareholder or director of Sharp. (SMJ Mem at 5.) KPMG asserts that "the only evidence of Bohorodzaner's stake in the company consists of documents provided by the Spitzes to him (and not shared with outsiders) purporting to grant him 13% of the shares in the company and a board position." (SMJ Mem at 5.)

Prior to 1997 and continuing through October of 1999, the Spitzes designed and executed an elaborate fraud by falsifying Sharp's inventory, accounts receivable, and fixed assets balances. (Complaint ¶ 15–17; SMJ Mem at 1–3.) Using these inflated figures, the Spitzes caused Sharp to raise large sums of money from lenders and investors. (Complaint ¶ 18; SMJ Mem at 3.) The Spitzes then looted Sharp of the monies they caused it to fraudulently raise by diverting tens of millions of dollars to a variety of companies—most of which were owned by or affiliated with the Spitzes— that provided no goods, services or other consideration to Sharp. (Complaint ¶ 19.)

The Trustee asserts, and KPMG has not disputed, that neither Bohorodzaner, Inc. nor Mr. Bohorodzaner played any role in, or had knowledge of, the fraud and embezzlement committed by the Spitzes, because the Spitzes actively concealed their fraud. (Complaint ¶ 14.)

KPMG was engaged in January 1998 to re-audit Sharp's financial statements for

---

2. "SMJ Memo" refers to the Memorandum of Law of KPMG LLP in Support of Motion for Summary Judgment.

3. "Tr. Resp. Mem" refers to the Plaintiff Chapter 11 Trustee's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

the fiscal year ending March 31, 1997. (Complaint ¶¶ 23–25; SMJ Mem at 2; KPMG Engagement Letter dated January 14, 1998.) KPMG subsequently audited Sharp's March 31, 1998 financial statements. (Complaint ¶¶ 23–24; SMJ Mem at 3.) KPMG failed to detect the fraud and issued unqualified audit opinions for both financial years. (Complaint ¶ 28.) Questions about Sharp's practices arose in the course of KPMG's audit of Sharp's March 31, 1999 financial statements, leading to KPMG's resignation and the withdrawal of its audit reports for the company's March 31, 1997 and 1998 financial statements. (Complaint ¶ 41; SMJ Mem at 7; Letter from KPMG to Sharp Board of Directors, dated July 1, 1999.)

On September 7, 1999, an involuntary petition under chapter 11 of the Bankruptcy Code was filed against Sharp. (Complaint ¶ 8.) An order for relief was entered on October 4, 1999 with Sharp's consent, and this Court appointed FTI/Kahn Consulting, Inc. ("Kahn") as responsible officer of Sharp, with authority to manage Sharp's business, financial and legal affairs during the chapter 11 case, removing the Spitzes from the operation of the business. (Complaint ¶ 8.) Under Kahn's management, Sharp continued to operate its business and manage its assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code until October 2, 2001, when the Trustee was appointed.

### Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Bankr.P. 7056(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548,

91 L.Ed.2d 265 (1986.) The Court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986.) No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505.

"If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994) (citation omitted). "In ruling on the motion, the court is not entitled to weigh the evidence." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir.2000) (citations omitted).

### Discussion

 "Standing ... is a threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their claims litigated in federal court." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir.1991) (citation omitted). The party whose standing is challenged must have a "personal stake in the outcome of the controversy" in order to meet the case and controversy requirement of Article III of the Constitution. *Breeden v. Kirkpatrick & Lockhart*, 268 B.R. 704, 708–709 (S.D.N.Y.2001) *citing Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Wagoner*, 944 F.2d at 118. A party must "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interest of third parties" to meet

the prudential requirement of standing. *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.),* 278 B.R. 28, 35 (Bankr. E.D.N.Y., 2002) *citing Wight v. BankAmerica Corp.,* 219 F.3d 79, 86 (2d Cir.2000); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1091 (2d Cir.1995); *Wagoner,* 944 F.2d at 118.

 "The 'case and controversy' requirement coincides with the scope of the powers the Bankruptcy Code gives a trustee, that is, if a trustee has no power to assert a claim because it is not one belonging to the bankruptcy estate, then he also fails to meet the prudential limitation that the legal rights asserted must be his own." *Wagoner,* 944 F.2d at 118; *Hirsch,* 72 F.3d at 1091. "Under the Bankruptcy Code the trustee stands in the shoes of the bankrupt corporation, and he has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Wagoner,* 944 F.2d at 118; *Hirsch,* 72 F.3d at 1093. "It is well settled that a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Wagoner,* 944 F.2d at 118 (citations omitted). The Trustee therefore only has standing to bring claims that Sharp itself had standing to pursue at the time Sharp was forced into bankruptcy in 1999.

*Breeden v. Kirkpatrick and Lockhart LLP (In re Bennett Funding Group, Inc.),* is the most recent articulation of the Wagoner rule in this Circuit. 336 F.3d 94 (2d Cir.2003). *Wagoner* held that "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Wagoner,* 944 F.2d at 120 (citations omitted); *see also Hirsch,* 72 F.3d at 1094 (finding that the trustee lacked standing to assert professional mal-

practice claims against third parties because of the "debtor's collaboration with the [defendants] in promulgating and promoting the [fraud]"). The rationale for the Wagoner rule is "the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Breeden,* 336 F.3d 94, 100 (2d Cir.2003), *citing Wight v. BankAmerica Corp.,* 219 F.3d 79, 86 (2d Cir.2000).

 The Wagoner rule will not be invoked where the adverse interest exception applies. *Breeden,* 336 F.3d at 100. This means that the wrongful acts of the agent will not be imputed to the corporation if the agent, although purportedly acting for the corporation, "is really committing a fraud for his own benefit." *Id.* at 100, *quoting Wight,* 219 F.3d at 87. "The theory is that 'where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it'." *Wight,* 219 F.3d at 87, *quoting Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936). This adverse interest exception applies "only when the agent has 'totally abandoned' the principal's interests." *Breeden,* 336 F.3d at 100, *quoting In re Mediators, Inc.,* 105 F.3d 822, 827 (2d Cir.1997).

 The adverse interest exception is, in turn, subject to the sole actor rule, which, if applicable, invokes the Wagoner rule even if the management acted adversely to the interests of the corporation. *Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.),* 278 B.R. 28, 37 (Bankr. E.D.N.Y.2002). The sole actor rule applies "where the principal and agent are one and the same," and precludes the trustee from raising the adverse interest exception as a defense, because "notwith-

standing the agent's self-dealing ... the party that should have been informed was the agent itself albeit in its capacity as principal." *Id., citing Mediators Inc. v. Manney, et al. (In re The Mediators, Inc.),* 105 F.3d 822, 827 (2d Cir.1997).

■ In determining whether the sole actor rule applies, such that management misconduct must be imputed to the corporation, the question is, under what circumstances must principal and agent be considered one and the same. In *Breeden,* the Second Circuit declined to address "whether the presence of innocent directors would provide the trustee with standing where fewer than all shareholders are implicated in the fraud, because that case is not before us." *Breeden,* 336 F.3d at 101. Citing with approval the bankruptcy court's holding in *Bankruptcy Services Inc. v. Ernst and Young (In re CBI Holding Co., Inc.),* 247 B.R. 341, 364–65 (Bankr.S.D.N.Y.2000) that imputation applies unless "at least one decisionmaker in a management role or amongst the shareholders is innocent and could have stopped the fraud," the Court held that the factual record developed by the district court established that no such person existed in that case. *Breeden,* 336 F.3d at 101.

KPMG asserts that the same conclusion must be reached here, because Bohorodzaner was not a decisionmaker who could have stopped the fraud had he discovered it. To support this assertion, KPMG relies primarily on deposition testimony given by Bernard and Lawrence Spitz to the effect that Bohorodzaner was denied any role in Sharp's business or management.

In opposition, the Trustee cites testimony by Bernard Spitz that the fraud was carefully concealed from Bohorodzaner because the Spitzes believed that he would have put a stop to it had he known of it. The Trustee also points to the Shareholders Agreement, which gave Bohorodzaner broad powers, including a seat on the Board of Directors and membership in Sharp's two-person Compensation Committee, as well as the power to veto all significant corporate transactions.

■ The evidence proffered by the Trustee is certainly sufficient to create a genuine issue of material fact whether Bohorodzaner's role at Sharp was such that his presence in the case, as an innocent director and shareholder, defeats imputation. In arguing that *Breeden* compels a different result, KPMG glosses over the relevant facts and procedural context of that case.

First of all, *Breeden* was decided after a four-day evidentiary hearing on the issue of standing, at which the district court heard testimony, weighed the evidence and reached factual conclusions. In the context of this motion, it is impermissible to weigh the evidence, as KPMG would have this Court do. *St. Pierre,* 208 F.3d at 404.

Second, KPMG ignores the many distinctions between the facts found in *Breeden* and the evidence proffered in this case.

*Breeden* involved "what at the time it was uncovered was characterized as the greatest Ponzi scheme on record," whereby Bennett Funding Group, Inc. ("BFG") sold and resold the same office equipment leases. *Breeden,* 336 F.3d at 97. BFG was a family run business in which Bud and Kathleen Bennett, a husband and wife, were the sole shareholders and their sons, Patrick and Michael, were CFO and CEO, respectively. Patrick Bennett was the architect of the Ponzi scheme and the district court found that the other Bennett family members were complicit in the scheme. *Bennett,* 268 B.R. at 710.

BFG's chapter 11 trustee sued the company's lawyers and accountants, alleging

that they should have detected the fraud. *Id.* at 96. BFG's bankruptcy trustee conceded that BFG was a family-run "dictatorship" and that Patrick Bennett had total control of the company's finances. *Id.* at 97. The BFG trustee asserted that presence of four innocent members on the BFG board of directors nevertheless defeated imputation of the fraud to the company under the Wagoner rule. The district court found otherwise, and the Court of Appeals affirmed.

Facts which persuaded the Court of Appeals that the presence of these innocent directors did not defeat the application of the Wagoner rule were that the directors were "hand picked" by the shareholders, and were BFG employees; that the Bennett family did not "tolerate any questioning that could have uncovered the fraud," and fired BFG's controller when he sought information concerning questionable transactions; that when BFG's auditors, Arthur Andersen, refused to issue a clean opinion in 1991, they were summarily fired without a mention to the Board; and that when the shareholders were confronted with clear evidence of fraud in 1995, they placed all of their BFG stock in a trust, the language of which insured that Patrick Bennett would be Chairman of the Board and CEO of BFG in perpetuity. *Bennett,* 336 F.3d at 98. Based upon this, the Court of Appeals concluded that "each so-called independent director was impotent to actually do anything." *Id.* at 101. Clearly this was the case; the BFG directors were subject to removal or termination by Bud and Kathleen Bennett, BFG's sole shareholders, and had no authority except as given to them by the Bennett family.

Indeed, it is difficult to see what the BFG directors could, even theoretically, have done to stop the fraud. Informing the shareholders would have been useless, as the district court found that they were complicit in the fraud. Informing the company's auditors would have been equally futile; Patrick Bennett would simply have fired the auditors, as he did in 1991 when they refused to issue a clean opinion. Commencing legal action against BFG or the corrupt management would have been of dubious efficacy as well; the Bennetts, if they got wind of such a plan, could have fired them and removed them as directors, thereby depriving them of standing, just as they fired BFG's controller when he sought information they did not want to reveal. Perhaps one of the innocent directors could have informed the SEC about the fraud; but, as the district court found, none of them were able to testify that they would have would have done so, and in any event, "[i]t is unclear whether such insiders would have had the legal ability to approach third-parties with information about the Ponzi scheme." *Bennett,* 268 B.R. at 713.

The facts presented in this case are quite different. The Spitzes were not the sole shareholders of Sharp; Bohorodzaner held 13% of the shares of the company.[4] As a shareholder, Bohorodzaner had standing to commence a derivative action against the Spitzes or an action to enforce his rights under the Shareholders Agreement and applicable law. N.Y. Bus Corp § 720 (Consol.2004); *Levine v. Chavkin,* 82 Misc.2d 441, 443–444, 369 N.Y.S.2d 588, 590 (Sup.Ct.1974). Pursuant to the Shareholders' Agreement, Bohorodzaner was given a position on the Board of Directors,

---

4. KPMG asserts that it is not clear that Bohorodzaner was actually a shareholder or director, given that there is no documentation reflecting his interest other than the documentation provided to him by the Spitzes.

Whether or not KPMG seriously disputes Bohorodzaner's status as shareholder or director, there is at a minimum a genuine issue of material fact in this regard.

which could not be taken away by the Spitzes. The Shareholders Agreement also gave Bohorodzaner broad powers to veto major corporate transactions. Unlike the Bennetts, the Spitzes did not have the power to fire Bohorodzaner or remove him from the Board if he asked inconvenient questions. Most telling of all is Bernard Spitz's testimony that he and his brothers regarded Bohorodzaner as capable of putting a stop the fraud and therefore took pains to conceal it from him. The fact that the Spitz's efforts to conceal their fraud were successful does not mandate imputation of that fraud to Sharp.

In short, the *Breeden* case does not compel summary judgment in favor of KPMG based on an application of the Wagoner rule. Indeed, a review of the facts found in *Breeden*, which may be contrasted with the facts presented here, serves to highlight the material factual issues which must be tried in order to determine whether, as the district court put it in *Breeden*, there was at Sharp "a person with the ability to bring an end to the fraudulent activity at issue." *Breeden*, 268 B.R. at 710. Resolution of those factual issues will require review and weighing of all of the evidence, and may turn in substantial measure upon the credibility of testimony, particularly that of the Spitzes.

In view of this conclusion, it is not necessary at this juncture to determine whether, as the Trustee contends, Sharp's claims against KPMG are not subject to the Wagoner rule because KPMG is not alleged to have been complicit in the Spitz's fraud. *See In re CBI Holding Co.*, 311 B.R. 350, 374 (S.D.N.Y.2004). That question is therefore not decided.

### *Conclusion*

For the reasons stated in this opinion, KPMG's motion for summary judgment is denied. Sharp is directed to settle an order consistent with this opinion.